**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| DONNA L. BREWER, | | |
| Plaintiff, | | Civ. No. 06-6294 (DRD) |
| v. | | **O P I N I O N** |
| GEORGE W. HAYMAN, in his official capacity as COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF CORRECTIONS; ALFARO ORTIZ, FORMER ADMINISTRATOR EAST JERSEY STATE PRISON, in his individual capacity; MICHAEL POWER CURRENT ADMINISTRATOR OF EAST JERSEY STATE PRISON, in his official capacity; SENIOR CORRECTIONS OFFICERS F/N/U WALLACE (female) and F/N/U WELSH, LT. F/N/U MURRAY, JOHN DOE 1 AND JAMES DOE 1, and the NEW JERSEY DEPARTMENT OF CORRECTIONS, | | |
| Defendants. | | |

*Appearances by:*

LOUGHRY & LINDSAY, LLC
By: Justin T. Loughry, Esq.
330 Market Street
Camden, NJ 08102

    *Attorneys for Plaintiff,*

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY

R.J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625

By: Thomas E. Kemble, Esq.
Deputy Attorney General

*Attorney for Defendants.*

**<u>DEBEVOISE, Senior District Judge</u>**

Plaintiff, Donna L. Brewer ("Brewer"), filed suit against prison officials for subjecting her to an unreasonable "strip search" when she visited the East Jersey State Prison ("EJSP"). Also, she alleges that Defendants discriminated against her because wheelchair-bound visitors, like herself are subjected to more intrusive searches than able-bodied visitors.

Defendants, in their official capacities, are George W. Hayman, acting Commissioner of the New Jersey Department of Corrections ("NJDOC") and Michael Power, current Administrator of EJSP. Defendants, in their individual capacities, are Alfredo Ortiz, former Administrator of EJSP; Officer John Doe 1, Officer James Doe 1, and Lt. Daniel Murray, supervisory officers at EJSP; and Natalie Wallace and Marie Welsh, officers who conducted the search.

Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56 on multiple claims.[1] Brewer moved for partial summary judgment on her NJLAD discrimination claim. For the reasons set forth below, Defendants' motion will be denied in part and granted in part. Brewer's motion will be granted.

## I. BACKGROUND

---

[1] Defendants alternatively brought a motion to dismiss. Because the parties have submitted evidentiary material, the Court will treat Defendants' motion as a motion for summary judgment.

Prior to the current motions, Defendants moved to dismiss the Amended Complaint, in part, on the grounds that the claims for damages against Defendants in their official capacities in Count One were barred by the Eleventh Amendment and that Brewer was also not entitled to injunctive relief in Count Three. See Brewer v. Hayman, No. 06-6294 2007 WL 2688939, at *1 (D.N.J. Sept. 11, 2007). Because in Count One Brewer seeks damages against Defendants in their individual capacities only, that motion was not considered. Id. Defendants' motion regarding injunctive relief was denied. Id.

Brewer, the wife of an inmate at EJSP, had visited the prison on several occasions without incident prior to the search at issue. Ten days prior to this search, Brewer sent a letter to EJSP administrators, including Ortiz, complaining about the treatment of her husband at the prison. Frequently, she used her wheelchair when visiting the prison because she suffers from a joint disease that is too painful when walking substantial distances, such as from the prison parking area to the prison entrance.

EJSP has two entrances – a main entrance for able-bodied visitors and a separate entrance for wheelchair-bound visitors. Visitors entering the main entrance must climb a staircase, walk down a narrow hallway, and pass through a metal detector. Visitors entering the wheelchair entrance are wheeled through a receiving gate and then brought to a side office to be searched. On the day of the search at issue, Brewer used the wheelchair entrance and then was told by Officers Wallace and Welsh that she would need to be searched in the side office because there was not a walk-through metal detector at that entrance. The parties dispute the facts about the nature of the search that took place.

Brewer claims that she was unable to maneuver her wheelchair through the side office's doorway, which had an opening of 28 inches. Thus, the search was conducted in the doorway in

view of whoever was in the congregating area. She then claims that Wallace directed her to stand, to lift her shirt up, to lift her bra up, to bend over and to shake her breasts.

Alternatively, Defendants claim that the wheelchair was fully inside the side office and that Brewer was explicitly told not to expose herself and not to lift up her shirt. In her deposition, Wallace said that she told Brewer to "come on top of [her] shirt and shake [her] bra," without uncovering and at which point she would "pat [her] down." (Wallace Dep. 40:1-7, Nov. 12, 2008.) The Officers claim that this is exactly what occurred and that Brewer never exposed herself.

Additionally, it is clear that the Officers did not use a hand held metal detection "wand" on Brewer prior to this search. Although there is a conflict among Defendants as to the policy and practice of the wand, Supervisor Ortiz testified that one was available for officers to use.

Specifically, Brewer alleges 42 U.S.C. § 1983 violations of her federal constitutional rights under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution and their New Jersey constitutional counterparts. Also, she alleges violations of her rights to be free of discrimination based upon physical disability under the New Jersey Law Against Discrimination ("NJLAD"). N.J.S.A. § 10:5-1, et seq.. Lastly, she alleges state common law claims of assault and invasion of privacy. The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and over the pendant state claims pursuant to 28 U.S.C. § 1367.

In Defendants' motion for summary judgment they claim that (1) they are entitled to qualified immunity from the Fourth Amendment § 1983 violations, (2) Defendants Ortiz and Murray were not personally involved in the search and should be dismissed, (3) Brewer is not entitled to punitive damages with respect to her federal claims, (4) Defendants provided a

reasonable accommodation to Brewer's access needs and thus NJLAD claims should be dismissed, (5) Brewer is not entitled to punitive damages with respect to NJLAD claims, (6) Brewer cannot establish a prima facie case for common law state claims of assault or invasion of privacy, (7) Defendants are immune from state claims, and (8) the New Jersey Tort Claims Act bars Brewer from seeking damages for pain and suffering with respect to her state claims. In Brewer's cross motion, she claims Defendants' search facility and procedures against a disabled visitor violated NJLAD.

## II. DISCUSSION

**A.    Standard of Review for Summary Judgment**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a

genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.    42 U.S.C. § 1983 Claim**

   ***i.    Qualified Immunity on Fourth Amendment Claim***

In addressing Defendants' claim that they are entitled to qualified immunity from the Fourth Amendment § 1983 violations, the Court must follow a two-part test. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, --- U.S. ----, 129 S.Ct 808, 815 (2009). First, the Court must decide whether the facts the plaintiff alleges make out a violation of a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Second, the Court must decide whether the right was clearly established at the time of the defendants' alleged misconduct. Id.

Applying the first part of the test, the Supreme Court's opinion in Bell v. Wolfish, 441 U.S. 520 (1979) forms the proper starting point in determining the constitutionality of suspicionless strip searches of prison visitors. In that case, the Court upheld a strip and visual body cavity search of pre-trial detainees. Id. at 560. Because the body cavity searches involved a visual inspection, those searches can be characterized as strip searches as well. In upholding

the searches, the Court conducted an analysis that balanced the need for the searches against the invasion of personal rights.  Id.  Although the Court said that the practice of strip searching individuals "instinctively gives us the most pause," it found the searches constitutional because of the security needs of the prison.  Id. at 558.  The Court concluded that "visual body-cavity inspections . . . can . . . be conducted on less than probable cause," Id. at 560, suggesting that there must be some basis for the strip search.  The Court said only that probable cause is *not* necessary to conduct a strip search; it left to the lower courts to define exactly what kind of cause is needed.

In the thirty years since Bell, nine of the ten Circuit Courts that have encountered the issue have held that prison officials must possess reasonable individualized suspicion before strip searching prison visitors or pre-trial detainees.  See, e.g., Spear v. Sowders, 71 F.3d 626, 630 (6th Cir. 1995) (regarding as "clearly established" the requirement that officials have reasonable suspicion before conducting strip searches of prison visitors); Romo v. Champion, 46 F.3d 1013, 1020 (10th Cir. 1995) (applying the rule that the Fourth Amendment requires individualized reasonable suspicion when subjecting prison visitors to strip searches); Weber v. Dell, 804 F.2d 796, 802, 804 (2d Cir. 1986) (holding that reasonable suspicion that an accused minor offender is concealing contraband is necessary before subjecting the person to a strip search because of the intrusive and demeaning nature of such an investigative procedure); Blackburn v. Snow, 771 F.2d 556, 567 (1st Cir. 1985) (holding that "the Constitution requires a more particularized level of suspicion to justify the humiliating and intrusive searches conducted" of prison visitors by being strip searched); Thorne v. Jones, 765 F.2d 1270, 1276 (5th Cir. 1985) (applying a reasonable suspicion standard to strip searches of prison visitors); Giles v. Ackerman, 746 F.2d 614, 615 (9th Cir. 1984) (holding that "arrestees for minor offenses may be subjected to a strip

search but only if jail officials have a reasonable suspicion that the particular arrestee is carrying or concealing contraband"); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir. 1983) (requiring reasonable suspicion by authorities before strip searching minor offender detainees);[2] Hunter v. Auger, 672 F.2d 668 (8th Cir. 1982) (holding that "the Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal institutions"); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981) (holding that "[a]n indiscriminate strip search policy routinely applied to detainees . . . cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations."). See also Safford Unified Sch. Dist. No. 1 v. Redding, --- S.Ct. ---, 2009 WL 1789472 U.S., 2009 (holding a principal's reasonable suspicion that a student was distributing contraband drugs did not justify a strip search of a thirteen year old middle school student). But see Powell v. Barrett, 541 F.3d 1298, 1303 (11th Cir. 2008) (holding that full body visual strip searches of detainees did not violate the Fourth Amendment regardless of whether there was any reasonable suspicion to believe that the inmates were concealing contraband).[3] This near consensus by the Courts of Appeal in requiring reasonable individualized suspicion before conducting a strip search is

---

[2] A recent Seventh Circuit Court of Appeals case held that a police officer would have reasonable suspicion to require an arrestee to participate in a clothing exchange, whereby she exposed her breasts. See Stanley v. Henson, 337 F.3d 961 (7th Cir. 2003). The court maintained that reasonable suspicion is required and reasoned that jail officials must view an arrestee with a minimal amount of suspicion, especially when charged with battery of a police officer where little information is known regarding the circumstances. Id. at 967.

[3] It is important to note that Powell overruled Wilson v. Jones, 251 F.3d 1340 (11th Cir. 2001) and Skurstenis v. Jones, 236 F.3d 678 (11th Cir. 2000), which were the governing the law at the time Brewer's search occurred, and which had both held that reasonable suspicion was required before conducting a strip search. Since as early as 1992, the Eleventh Circuit Court of Appeals had following the "reasonable suspicion" standard. See Justice v. City of Peachtree City, 961 F.2d 188, 193 (11th Cir. 1992) (holding that law enforcement officers may conduct a strip search of a minor offender, but only when based upon reasonable suspicion that he or she is concealing contraband because of "the extremely intrusive nature of a strip search").

further supported by "valid concerns for privacy, dignity, and the preservation of self-worth."

Florence v. Bd. of Chosen Freeholders, 595 F. Supp. 2d 492, 513 (D.N.J. 2009).

Here, two versions of the search are alleged. Accepting Brewer's version, as one must on a summary judgment motion, the search that took place would constitute a strip search under federal law. The Supreme Court and this Circuit have not defined what constitutes a strip search. The Court of Appeals cases cited above involve strip searches in which the visitors were required to disrobe, often times exposing their gentiles as well as their breasts. The Eleventh Circuit Court of Appeals has defined a strip search as something less than full nudity -- when the police ordered a minor pre-trial detainee to "strip down to her panties." Justice, 961 F.2d at 190. See also Stanley, 337 F.3d at 961 (finding it unnecessary to decide whether an observed clothing exchange, where a pre-trail detainee was required to expose her breasts because she was not wearing a brassiere, was a "strip search" or merely a "search"). Moreover, in Doe v. Calumet City, Ill., 754 F.Supp. 1211, 1218 (N.D. Ill. 1990), the court recognized that "deeply imbedded in our culture…is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their 'private' parts observed or touched by others".

Thus, a disrobing of clothing exposing a private part of a woman's body such as her breast is a "strip search". This is consistent with New Jersey law, which defines a strip search as "the removal or rearrangement of clothing for the purpose of visual inspection of the person's . . . breasts." N.J. STAT. ANN. § 2A:161 A-3 (West 1985); see also e.g. MO. ANN. STAT. § 544.193 (West 1980); IOWA CODE ANN. § 702.23 (West 1980); WASH. REV. CODE ANN. § 10.79.070 (West 1983); CAL. PENAL CODE § 4030 (West 1984).

Although this Court has not ruled on a prison visitor strip search, for over twenty years it has consistently held that reasonable individualized suspicion is required prior to the strip search of a pre-trial detainee.  In <u>Davis v. City of Camden</u>, 657 F. Supp. 396, 400 (D.N.J. 1987), the court held that because "individualized suspicion clearly was lacking . . . [and] officers had no reasonable suspicion that plaintiff was concealing weapons or contraband" the strip search conducted of a pre-trial detainee was unconstitutional.  That same year in <u>Roderique v. Kovac</u>, No. 85-5778, 1987 WL 170058, at *3 (D.N.J. Sept. 14, 1987), the court followed <u>Davis</u>, reciting that "[t]he <u>Davis</u> court found persuasive the holding of [then] eight Circuit Courts of Appeals that 'there must be a reasonable suspicion . . . in order for a strip search to be constitutionally justified'" (internal quotations omitted).  In <u>O'Brien v. Borough of Woodbury Heights</u>, 679 F. Supp 429, 434  (D.N.J. 1988), the court held that because none of the police officers "bore any suspicion, reasonable or otherwise, that either arrestee was concealing weapon or contraband," the strip searches "were not only unconstitutional . . . [t]hey were senseless."  The court in <u>Florence</u>, 595 F. Supp. 2d at 513, which was decided after the Brewer search occurred, held that "the overwhelming authority still supports the conclusion that blanket strip searches . . . performed without reasonable suspicion for drugs, weapons, or other contraband, is unconstitutional."

Moreover, in judging the constitutionality of strip searches for detainees, at least four Courts of Appeals have drawn a distinction between those charged with misdemeanors and those charged with felonies.  See <u>e.g.</u>, <u>Masters v. Crouch</u>, 872 F.2d 1248, 1255 (6th Cir. 1989); <u>Stewart v. Lubbock County, Tex.</u>, 767 F.2d 153, 156-7 (5th Cir. 1985); <u>Giles</u>, 746 F.2d at 617; <u>Mary</u>

Beth G., 723 F.2d at 1273.[4]  This District makes a similar distinction between indictable and non-indictable offenses.  See e.g., Ernst v. Borough of Fort Lee , 739 F. Supp. 220, 225 (D.N.J. 1990).  If those distinctions exist, then one would expect a distinction exists between a visitor who has not been accused of a crime and a pre-trial detainee who has. Visitors surely have equal, if not greater, privacy rights than pre-trial detainees.  Thus visitors should at least assume the same treatment – a reasonable individualized suspicion before being strip searched – as pre-trial detainees.  Therefore, the facts Brewer allege do make out a violation of a constitutional right.

Applying the second part of the test, it was clearly-established law as early as 1981 in other Circuits and as early as 1987 in this District that the special considerations of prison security do not justify a strip search of visitors and/or pre-trial detainees without reasonable individualized suspicion that the person being searched is in possession of a weapon or contraband.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 202 (2001).  "[T]he responsibility for keeping abreast of constitutional developments in criminal law falls squarely on the shoulders of law enforcement officials.  'Given the power of such officials over our liberty, and sometimes even over our lives, this placement of responsibility is entirely proper.  Law enforcement officials must be cognizant not only of how far their authority extends, but also of the point at which their authority ends.'"  Bull v. City and County of San Francisco, 539 F.3d 1193, 1196 (9th Cir. 2008) (quoting Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir. 1986)).

---

[4] The Eleventh Circuit Court of Appeals rejected this distinction in 2008 by overruling its own precedent that distinguished misdemeanor search procedures from that of felony search procedures.  See Powell, 541 F.3d at 1303.  However, this decision was not the governing law at the time Brewer's search occurred.

There is a factual dispute as to the extent of the search to which Brewer was subjected. Brewer testified that she was searched in the doorway of the side room in view of whoever was in the open area immediately outside the room where the visitors were all funneled and made to wait before entering with the prison. She further testified that with Officer Welsh standing behind her and Officer Wallace standing in front of her, Officer Wallace told her to lift her blouse, disengage her breasts from her brassiere and shake them. Officer Wallace, on the other hand, testified: "...I explained to her that I'm going to need her to -- I said do not pull up your shirt or expose yourself. You just need to come on the top of your shirt and shake your bra. And at that time I'm going to pat you down to see if anything fell out and she said okay." (Wallace Dep. 40:1-7.)

There is a factual question as to the nature of the search. If it was as Brewer described it, there was an unconstitutional strip search in violation of her rights under the Fourth Amendment. The right was clearly established at the time the search was conducted, and a reasonable officer should have been aware of it. However, if the search was conducted in the manner Officer Wallace described it, there was no Fourth Amendment violation. In view of the factual issue the Court cannot grant Defendants' motion for summary judgment either on the Fourth Amendment issue or the qualified immunity issue.

### ii. *Respondeat Superior on Fourth Amendment Claim*

Next, Defendants seek dismissal of the Fourth Amendment claims against former Administrator Ortiz and Lt. Murray because the § 1983 claim against them is based solely upon respondeat superior. It is clear that supervisory liability under § 1983 cannot be predicated solely upon respondeat superior. See Polk County v. Dodson, 454 U.S. 312, 325 (1981). Instead, a supervisor must have had "personal involvement in the alleged wrongs." Rode v.

Dellarciprete, 845 F.2d 1195, 1207 (3d. Cir. 1988). "Personal involvement can be shown through the allegations of personal direction or of actual knowledge and acquiescence." Id. Actual knowledge can be inferred from the circumstances. See Baker v. Monroe Tp., 50 F3.d 1186, 1194 (3d. Cir. 1995). Acquiescence is shown "[w]here a supervisor...knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d. Cir. 1997).

A supervisor may also be liable if it is shown that he or she "established and maintained a policy, practice or custom which directly caused [the] constitutional harm" and did so with "deliberate indifference to the consequences." S.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 586 (3d. Cir. 2004) (quoting Stoneking v Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d. Cir. 1989)). In such a case, the plaintiff must identify a specific supervisory practice or procedure that the supervisor employed. See Sample v. Diecks, 885 F.2d 1099, 1118 (3d. Cir. 1989). Further, the plaintiff must show that that failure created an unreasonable risk of the constitutional violation, of which the supervisor was aware and indifferent to. Id.

Here, Brewer alleges that Ortiz was "responsible for training and supervision of correctional officers and their supervisors," and "for the promulgation and implementation of policies" surrounding searches of prison visitors. (Am. Compl. ¶ 7.) Providing training and supervision as well as promulgating policies could constitute personal involvement if there was evidence that Ortiz had knowledge of or specifically directed officers to conduct suspicionless strip searches, like the one Brewer alleged. Ortiz, in his deposition, stated that there should be at least some suspicion in order to conduct even a "pat down" search. (Ortiz Dep. 19:1-20:25, Dec. 18, 2008.) There is no evidence that Ortiz had knowledge of this particular search before or

when it took place.  When he inquired about it afterwards, he was told only that the officers did "with her what [they] do with everybody."  Id. at 28:1.

Nevertheless, Ortiz and Murray had responsibility to supervise and oversee the conduct of Officers Welsh and Wallace and all the other officers checking visitors into the prison.  Their testimony was confusing concerning the precise search which applied to wheelchair-bound visitors.  There is sufficient evidence for a jury to determine whether the training and supervision that Murray and Ortiz provided that officers, was such as to constitute personal involvement in the search to which Brewer was subjected.

### iii.     First Amendment Claim

Brewer also contends that Defendants violated her First Amendment right of free expression by imposing a penalty – the strip search – on her in retaliation for her letter sent to prison administrators complaining about the treatment of her husband at the prison.  While she claims the letter was sent to at least one defendant, Ortiz, there is no evidence in the record that he, in fact, had knowledge of the letter or directed officers Wallace or Welsh to retaliate because of the letter.  Furthermore, because Defendants do not move for summary judgment on this issue, the Court will not rule on this claim at this time.

### iv.     Punitive Damages with Respect to 42 U.S.C. § 1983 Claim

Defendants also claim that Brewer is not entitled to punitive damages with respect to her federal claims.  An award of punitive damages in an action under § 1983 is proper only when a plaintiff shows that defendant's conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protect rights of others."  Smith v. Wade, 461 U.S. 30, 56 (1983).  Here, looking at the facts in the light most favorable to Brewer, a jury could find that Officers Wallace and Welsh acted at least with reckless indifference to

Brewer's Fourth Amendment rights. Because law enforcement officers are presumed to know the law, both Wallace and Welsh should have known that suspicionless strip searches of prison visitors violate the Constitution, and a jury could award punitive damages if they find for Brewer. Thus Defendants' motion for summary judgment will be denied as to this issue.

## C.    Disability Discrimination State Claim

Regarding the discrimination claim, both parties move for summary judgment. In her Amended Complaint, Brewer contends that Defendants violated NJLAD by "fail[ing] to provide reasonable access and accommodations for handicapped visitors to EJSP." (Am. Compl. ¶ 35.) Defendants argue that they provided reasonable access and accommodations, and thus the NJLAD claims should be dismissed. For the reasons below, Defendants' motion will be denied, and Plaintiff's motion will be granted.

NJLAD provides in relevant part that "[a]ll persons shall have the opportunity...to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . disability." N.J.S.A. 10:5-4. Courts interpreting New Jersey law have found that prisons are places of public accommodation under NJLAD, following well-settled law that the federal Americans with Disabilities Act ("ADA") applies to prisons. Moore v. Correctional Medical Services, 2008 U.S. Dist. LEXIS 75796 at *3 (D.N.J. Sept. 29, 2008) (referring to Chislom v. McManimon, 275 F.3d 315, 325 (3d Cir. 2001).

Furthermore, the New Jersey Administrative Code ("NJAC"), implementing the NJLAD, requires in relevant part that:

> [a]n owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation shall make reasonable accommodations to the limitations of a patron or prospective patron who is a person with a disability, including making such reasonable modifications in policies, practices, or

> procedures, as may be required to afford goods, facilities, privileges, advantages, or accommodations to a person with a disability unless [such person or entity] demonstrates that making the accommodations would impose an undue burden on its operation."

N.J.A.C. §13.13-4.11(a). In determining whether an accommodation would impose an undue burden, the Court should consider (1) the size of the business running the place of public accommodation, (2) the nature and cost of the accommodation sought, (3) whether the accommodation sought will fundamentally alter the services, programs, or accommodations offered, and (4) whether the accommodation sought will destroy a building of historical significance. Id.

Because NJLAD relies on the same analytical framework as the ADA, it is appropriate to use its three-part test. D.G. v. Somerset Hills Sch. Dist., 559 F. Supp 2d 484, 502-03 (N.J.D. 2008). To make out a prima facie case for violation of the ADA, the plaintiff must show that she (1) has a disability, (2) is otherwise qualified to participate in a program, and (3) was denied the benefits of the program or discriminated against because of the disability. Id. at 503.

Here, Brewer is disabled because she cannot walk long distances without experiencing disabling pain due to her joint disease, has qualified for one form of disability or another since 2001, and has received Social Security Disability since 2005. Brewer is also qualified to participate in the program – i.e. to be a visitor of the prison – because she was visiting a relative.

Furthermore, Brewer was discriminated against on account of her disability because she was subjected to a more intrusive search than she would have been had she been able-bodied. If she were able-bodied, she would have been able to enter the main visitor entrance which has a walk-through metal detector. Then, if she passed through the metal detector without triggering it, she would have been permitted to enter the prison without any further search. However,

because she was in a wheelchair and could not climb the stairs or navigate the narrow hallway leading to the main visitor entrance, Brewer entered through the wheelchair entrance which does not have a walk-through metal detector. Even according to Defendants, wheelchair-bound visitors are subjected to more intrusive searches, such as a pat downs, because there is no walk-through metal detector. Moreover, according to Brewer, these pat downs are not conducted in a private search room because she could not fit her wheelchair through the side office doorway's opening and thus was in view of whoever was in the congregating area.

Brewer's suggestion of an alternative accommodation –a hand held metal detection "wand" – is reasonable and does not seem to create an undue burden. This wand, which was available to the prison officers according to Ortiz, could have served as a substitute for the walk-through metal detector located at the main entrance. This is especially true in Brewer's case because she could stand up and move away from the wheelchair so that it would not have triggered the wand. Then, if she did not set off the wand, she would have been permitted to enter the prison without a further search, just as able-bodied visitors were permitted.

Brewer also argues that Defendants should be required to widen the 28-inch opening to the side office to comply with New Jersey's access barrier regulation of 32-inches. See N.J.A.C. 5:23-7.1, et seq. (utilizing the accessibility standards contained in the ICC/ANSI A117.1-2003). However, the prison is exempted from these requirements because the doorway was constructed prior to 1977, when the pertinent regulation for the New Jersey Construction Code came into effect. N.J.A.C. 5:23-1.5 (a). Any pre-existing buildings "may continue in use and nothing herein shall be interpreted as requiring the repair, renovation, alteration or reconstruction of such buildings." N.J.A.C. 5:23-6.2 (f).

Although Defendants are not required to widen the doorway, they still must provide a similarly accessible private search room for wheelchair-bound visitors as they do for able-bodied visitors. Brewer suggests that setting up a partition to block the view of those in the congregating area would be a reasonable accommodation. There are no issues of material fact on the NJLAD claim. Because Defendants did not provide reasonable access and accommodations to wheelchair-bound visitors, Brewer's motion for summary judgment will be granted on this issue.

### iv. *Punitive Damages with Respect to Disability Discrimination Claim*

Defendants next claim that Brewer is not entitled to punitive damages with respect to her NJLAD claims. Because Brewer did not dispute this claim in her reply brief, the Court will assume Brewer is conceding this issue and Defendants are granted summary judgment on it.

## D. Common Law State Claims of Assault and Invasion of Privacy

### i. *Assault*

In New Jersey, to establish a common law tort of assault, a plaintiff must show that (1) the defendants acted with intention to cause harm or offensive contact with the person, or an imminent apprehension of such a contact, and (2) that the other is thereby put in such imminent apprehension. See Leang v. Jersey City Bd. Of Educ,. 969 A.2d 1097, 1117 (N.J. 2009) (citing Wiggington v. Servidio, 734 A.2d 798 (App. Div. 1999)). Here, Brewer provides no evidence that Defendants acted with this intent; therefore the Court grants summary judgment to Defendants on this issue.

### ii. *Invasion of Privacy*

In New Jersey, to establish a common law tort of invasion of privacy, a plaintiff can claim either the tort known as "intrusion on seclusion" or "false light." Here, presumably

Brewer alleges the "intrusion on seclusion" claim, which imposes liability on "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Leang, 969 A.2d at 1115 (quoting Hennessey v. Coastal Eagle Point Oil, Co., 609 A.2d 11 (N.J., 1992). Here again, Brewer provides no evidence that Defendants acted with intent; therefore the Court grants summary judgment to Defendants on this issue.

**E.      Good Faith Immunity with Respect to State Claims**

Defendants allege that they are immune from Brewer's state claims pursuant to the New Jersey Tort Claims Act, N.J.S.A. 59:3-3. The Tort Claims Act provides immunity to public employees who "act[] in good faith in the execution or enforcement of any law." N.J.S.A. 59:3-3. On summary judgment, in order for immunity to apply, a public employee must "establish that [his or her] acts were objectively reasonable" or performed in good faith. Canico v. Hurtado, 144 N.J. 361, 365 (1996). There is no immunity if the acts constituted fraud, actual malice, or willful misconduct. N.J.S.A. 59:3-14(a). In some contexts, willful misconduct has been described as conduct that falls "between simple negligence and the intentional infliction of harm." Fielder v. Stonack, 661 A.2d 231, 242 (citation omitted).

Here, because the Court has already granted Defendants' summary judgment on the common law state claims, this issue need not be addressed with respect to those state claims. As to the NJLAD state claims, Defendants are not entitled to immunity because intentionally subjecting wheelchair-bound visitors to a more intrusive search procedure than able-bodied visitors is neither objectively reasonable nor a good faith effort and certainly conduct that is more than simple negligence.

**F.      Damages for Pain and Suffering with Respect to State Claims**

Defendants also allege that the New Jersey Tort Claims Act bars Brewer from seeking damages for pain and suffering with respect to her state claims. N.J.S.A. 59:9-2(d). In relevant part, the Tort Claims Act states that "no damages shall be awarded against a public entity or public employee" unless the plaintiff suffered "permanent loss of bodily function, permanent disfigurement or dismemberment where medical treatment expenses are in excess of $3,600." Id. However, when a public employee's actions constitute willful misconduct, a plaintiff need not satisfy this threshold. See Toto v. Ensuar, 196 N.J. 134 (2008). Whether the acts of the employee were willful is a question for a jury. Id. at 145.

Here, because the Court has granted Defendants summary judgment on the common law state claims, damages need not be addressed with respect to those state claims. As to the NJLAD state claims, because this Court has granted Brewer summary judgment, a jury must then decide whether Defendants' action constituted willful misconduct.

**G.      Injunction Claim**

Finally, Brewer brings a claim to enjoin Defendants Hayman and Power, in their official capacities, from continuing unlawful search procedures and discriminatory facilities. (Am. Compl. ¶ 42.) Because Defendants do not move for summary judgment on this issue, the Court will not rule on this claim at this time.

## III. CONCLUSION

Defendants' motion for summary judgment in their favor on Brewer's Fourth Amendment claims, on Brewer's claims for punitive damages on her Fourth Amendment claims and on her claims that she has been discriminated against in violation of NJLAD will be denied. Defendants' motion for summary judgment on Brewer's claim for punitive damages on her claim that she has been discriminated against in violation of NJLAD and on her state common law

claims of assault and invasion of privacy will be granted.  Brewer's motion for summary judgment on her claim of disability discrimination in violation of NJLAD will be granted.[5]

The Court will enter an order implementing this opinion.


**s/ Dickinson R. Debevoise**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: July 09, 2009

---

[5] Because the parties did not seriously address Brewer's First Amendment or injunction claim, this opinion did not deal with them.

There are seven named Defendants in this case: George W. Hayman, in his official capacity as acting Commissioner of the New Jersey Department of Corrections; Alfredo Ortiz, former administrator East Jersey State Prison; Michael Power, current administrator of EJSP in his official capacity; Senior Corrections Officer Wallace and Welsh; Lt. Murray; and the New Jersey Department of Corrections.  No persons have been named to substitute for the James and John Doe.

The parties have treated the Defendants generically, and, with the exception of Wallace, Welsh, Ortiz, and Murray on the Fourth Amendment claim, have not sought to establish which of the seven Defendants are potentially liable on the claims which remain in the case.  This is a matter that must be resolved by agreement or motion before the case is tried.